**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| BARBARA WASHINGTON, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. H-05-453 |
| | § | |
| JO ANNE B. BARNHART, Commissioner | § | |
| of the Social Security Administration, | § | |
| | § | |
| *Defendant.* | § | |

**MEMORANDUM AND ORDER**

Pending before the court are Plaintiff Barbara Washington ("Washington") and Defendant

Jo Anne B. Barnhart's, Commissioner of the Social Security Administration ("Commissioner"),

cross-motions for summary judgment.  Washington appeals the determination of an Administrative

Law Judge ("ALJ") that she is not entitled to receive Title II disability insurance benefits or Title

XVI supplemental security income benefits. *See* 42 U.S.C. § 416(i), 423, 1382c(a)(3)(A).  Having

reviewed the pending motions, the submissions of the parties, the pleadings, the administrative

record, and the applicable law, this Court is of the opinion that Washington's First Amended Motion

for Summary Judgment (Docket Entry No. 24) should be denied, the Commissioner's Motion for

Summary Judgment (Docket Entry No. 25) should be granted, and the Commissioner's decision

denying benefits be affirmed.

**I.    *Background***

Washington filed an application for disability insurance benefits and supplemental security

income with the Social Security Administration ("SSA") on February 10, 2001, claiming that she

had been disabled and unable to work since August 10, 2000.  (R. 22, 65-104).  Washington alleges

that she suffers from a variety of disabling conditions, including systemic lupus erythamatosus

("SLE" or "lupus"),[1] chronic pain, anemia,[2] and high blood pressure. (R. 22, 68-69, 71). After being denied benefits initially and on reconsideration (R. 30-31, 34-38), Washington requested an administrative hearing before an ALJ. (R. 32).

A hearing was held on August 20, 2002, in Bellaire, Texas, at which time the ALJ heard testimony from Washington, Gwendolyn Gladny Higginbothom, a friend of Washington's, Steven Goldstein, M.D. ("Dr. Goldstein"), a medical expert, and Byron J. Pettingill, a vocational expert ("VE"). (R. 22, 301-350). In a decision dated September 27, 2002, the ALJ denied Washington's application for benefits. (R. 22-28). On October 24, 2002, Washington appealed the ALJ's decision to the Appeals Council of the SSA's Office of Hearings and Appeals. (R. 18). After granting Washington's counsel several extensions and receiving and considering supplemental evidence, the Appeals Council, on December 17, 2004, denied Washington's request to review the ALJ's determination. (R. 5-9). This rendered the ALJ's opinion the final decision of the Commissioner. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000). Washington filed this case on February 10, 2005, seeking judicial review of the Commissioner's denial of her claim for benefits. *See* Docket Entry No. 1.

---

[1] "Systemic lupus erythamatosus" is a chronic, remitting, relapsing inflammatory, often febrile multisystemic disorder or connective tissue, acute or insidious in onset, characterized principally by involvement of the skin, joints, kidney, and serosal membranes. It is of unknown etiology, but it is thought to represent a failure of regulatory mechanisms of the autoimmune system, as suggested by the high level of numerous autoantibodies against nuclear and cytoplasmic cellular components. It is marked by a wide variety of abnormalities, including arthritis and arthralgias, nephritis, central nervous system manifestations, pleurisy, pericarditis, leukopenia or thrombocytopenia, hemolytic anemia, elevated erythrocyte sedimentation rate, and positive LE-cell preparations. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1032 (29th ed. 2000).

[2] "Anemia" is a reduction below normal in the concentration of erythrocytes or hemoglobin in the blood, measure per cu mm or by volume of packed red cells per 100 mL of blood; it occurs when the equilibrium is disturbed between blood loss (through bleeding or destruction) and blood productions. *See* DORLAND'S, *supra*, at 77.

II.     *Analysis*

A.      *Statutory Bases for Benefits*

SSI benefits are authorized by Title XVI of the Act and are funded by general tax revenues. *See* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100 (14th ed. 2001). The SSI Program is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line. *See* 20 C.F.R. § 416.110. Eligibility for SSI is based upon proof of indigence and disability. *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C). A claimant applying to the SSI program cannot receive payment for any period of disability predating the month in which she applies for benefits, no matter how long she has actually been disabled. *See Brown v. Apfel*, 192 F.3d 492, 495 n.1 (5th Cir. 1999); *see also* 20 C.F.R. § 416.335. The applicable regulation provides:

> When you file an application in the month that you meet all the other requirements for eligibility, the earliest month for which we can pay you benefits is the month following the month you filed the application. If you file an application after the month you first meet all the other requirements for eligibility, we cannot pay you for the month in which your application is filed or any months before that month.

20 C.F.R. § 416.335. Thus, the month following an application, here, February 2001, fixes the earliest date from which benefits can be paid. Eligibility for SSI payments, however, is not dependent on insured status. *See* 42 U.S.C. § 1382(a).

Social Security disability insurance benefits are authorized by Title II of the Act and are funded by Social Security taxes. *See also* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100. The disability insurance program provides income to individuals who are forced into involuntary, premature retirement, provided they are both *insured* and *disabled*, regardless of indigence. A claimant for disability insurance can collect benefits for up to twelve

3

months of disability prior to the filing of an application. *See* 20 C.F.R. §§ 404.131, 404.315; *Ortego v. Weinberger*, 516 F. 2d 1005, 1007 n.1 (5th Cir. 1975); *see also Perkins v. Chater*, 107 F.3d 1290, 1295 (7th Cir. 1997). For purposes of Title II disability benefits, Washington was insured through the date of the ALJ's decision—September 27, 2002. (R. 22, 27). Consequently, to be eligible for disability benefits, Washington must prove that she was disabled prior to that date.

While these are separate and distinct programs, applicants seeking benefits under either statutory provision must prove "disability" within the meaning of the Act, which defines disability in virtually identical language for both programs. *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a). Under both provisions, disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(3)(A). Moreover, the law and regulations governing the determination of disability are the same for both disability insurance benefits and SSI. *See Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120 (1995).

**B.** ***Standard of Review***

**1.** ***Summary Judgment***

The court may grant summary judgment under FED. R. CIV. P. 56(c) when the moving party is entitled to judgment as a matter of law because there is no genuine issue as to any material fact. The burden of proof, however, rests with the movant to show that there is no evidence to support the nonmoving party's case. If a reasonable jury could return a verdict for the nonmoving party, then

a motion for summary judgment cannot be granted because there exists a genuine issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

An issue of fact is "material" only if its resolution could affect the outcome of the case. *See Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir. 1991). When deciding whether to grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the nonmoving party, and deny the motion if there is some evidence to support the nonmoving party's position. *See McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 574 (5th Cir. 2000). If there are no issues of material fact, the court shall review any questions of law *de novo*. *See Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999). Once the movant properly supports the motion, the burden shifts to the nonmoving party, who must present specific and supported material facts, of significant probative value, to preclude summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *International Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000).

### 2.   *Administrative Determination*

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence. *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002). "Substantial evidence" means that the evidence must be enough to allow a reasonable mind to support the Commissioner's decision; it must be more than a mere scintilla and less than a preponderance. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Masterson*, 309 F.3d at 272; *Brown*, 192 F.3d at 496.

When applying the substantial evidence standard on review, the court "scrutinize[s] the record to determine whether such evidence is present." *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001) (citations omitted).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.  *See Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002). Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision.  *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).  The court may not, however, reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner.  *See Masterson*, 309 F.3d at 272.  In short, "[c]onflicts in the evidence are for the Commissioner and not the courts to resolve."  *Id*.

C.   ***ALJ's Determination***

An ALJ must engage in a five-step sequential inquiry to determine whether the claimant is capable of performing "substantial gainful activity," or is, in fact, disabled:

1.   An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.  *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

2.   An individual who does not have a "severe impairment" will not be found to be disabled.  *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).

3.   An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

4.   If an individual is capable of performing the work she has done in the past, a finding of "not disabled" must be made.  *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

5.   If an individual's impairment precludes performance of her past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed.  *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *accord Boyd*, 239 F.3d at 704-05.  The claimant

has the burden to prove disability under the first four steps.  *See Myers*, 238 F.3d at 619.  If the

claimant successfully carries this burden, the burden shifts to the Commissioner in step five to show

that other substantial gainful employment is available in the national economy, which the claimant

is capable of performing.  *See Masterson*, 309 F.3d at 272; *Greenspan*, 38 F.3d at 236.  If the

Commissioner is able to verify that other work exists in significant numbers in the national economy

that the claimant can perform in spite of her existing impairments, the burden shifts back to the

claimant to prove that she cannot, in fact, perform the alternate work suggested.  *See Boyd*, 239 F.3d

at 705.  A finding that a claimant is disabled or is not disabled at any point in the five-step review

is conclusive and terminates the analysis.  *See id.*

The mere presence of an impairment does not necessarily establish a disability.  *See Anthony*

*v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992).  An individual claiming disability benefits under the

Act has the burden to prove that she suffers from a disability as defined by the Act.  *See Newton*, 209

F.3d at 452; *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Johnson v. Bowen*, 864 F.2d 340,

343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985).  A claimant is deemed

disabled under the Act only if she demonstrates an "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period of

not less than 12 months."  *Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir. 2001); *accord Newton*, 209

F.3d at 452; *Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Cir. 1999); *Selders*, 914 F.2d at 618; *see*

*also* 42 U.S.C. § 423(d)(1)(A).  "Substantial gainful activity" is defined as work activity involving

significant physical or mental abilities for pay or profit.  *See Newton*, 209 F.3d at 452-53; *see also* 20 C.F.R. §§ 404.1572(a)-(b), 416.972.

A medically determinable "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983); *see also* 42 U.S.C. § 423(d)(3).  "[A]n individual is 'under a disability, only if his impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .'"  *Greenspan*, 38 F.3d at 236 (quoting 42 U.S.C. § 423(d)(2)(A)).  This is true regardless of whether such work exists in the immediate area in which the claimant resides, whether a specific job vacancy exists, or whether the claimant would be hired if she applied.  *See Oldham v. Schweiker*, 660 F.2d 1078, 1083 (5th Cir. 1981); *see also* 42 U.S.C. § 423(d)(2)(A).  In the case at bar, when addressing the first four steps, the ALJ determined:

1.   The claimant is insured for disability benefits through December 31, 2005.

2.   The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.   The claimant has the following "severe" medically determinable impairments: systemic lupus erythamatosus, anemia, and high blood pressure.

4.   The claimant's medically determinable impairments, singly or in combination, do not meet or medically equal the severity of an impairment enumerated in the Listings.

5.   The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.   The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 C.F.R. § 404.1527).

7.   The claimant retains the residual functional capacity to perform sedentary work.

8.   The claimant's past relevant work as data entry clerk and clerk typist did not require the performance of work-related activities precluded by her residual functional capacity (20 C.F.R. § 404.1565).

9.   The claimant's medically determinable [impairments] systemic lupus erythamatosus, chronic [pain], anemia, and high blood pressure do not prevent the claimant from performing her past relevant work as a data entry clerk and clerk typist.

10.  The claimant is not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 C.F.R. § 404.1520(e)).

(R. 27).  Because the ALJ found that Washington could perform her past relevant work, the ALJ did not proceed to step five of the sequential evaluation process.

This Court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards have been applied. *See Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 215; *Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452; *Greenspan*, 38 F.3d at 236; *see also* 42 U.S.C. §§ 405(g), 1383(c)(3).  To determine whether the decision to deny Washington's claim for disability benefits is supported by substantial evidence, the court weighs the following four factors: (1) the objective medical facts; (2) the diagnoses and opinions from treating and examining physicians; (3) the claimant's subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) the claimant's age, educational background, and work history.  *See Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)).  Any conflicts in the evidence are to be resolved by the ALJ and not the court.  *See Newton*, 209 F.3d at 452; *Brown*, 192 F.3d at 496; *Martinez*, 64 F.3d at 174; *Selders*, 914 F.2d at 617.

**D.**     ***Issues Presented***

Washington contends that the decision of the ALJ is not supported by substantial evidence. Specifically, Washington claims that the ALJ erred by:  (1) discounting her subjective allegations of pain and excessive fatigue; (2) rejecting her alleged mental impairment of depression as a non-severe impairment; and (3) failing to make a function-by function analysis before concluding that she could perform her past work as a data entry clerk and clerk typist.  *See* Docket Entry No. 24, at 6.  The Commissioner disagrees with Washington's contentions, maintaining that the ALJ's decision is supported by substantial evidence.  *See* Docket Entry No. 25.

**E.**     ***Review of ALJ's Decision***

   **1.**     ***Objective Medical Evidence and Opinions of Physicians***

When assessing a claim for disability benefits, "[i]n the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work."  *Sullivan v. Zebley*, 493 U.S. 521, 525 (1990).  If the claimant is not actually working and her impairments match or are equivalent to one of the listed impairments, she is presumed to be disabled and qualifies for benefits without further inquiry.  *See id.* at 532; *see also* 20 C.F.R. § 416.920(d).  When a claimant has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity."  42 U.S.C. § 423(d)(2)(B); *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).  The relevant regulations similarly provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered

> separately, would be of sufficient severity.  If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process.  If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

20 C.F.R. §§ 404.1523, 416.923; *see also Loza*, 219 F.3d at 393.  The medical findings of the combined impairments are compared to the listed impairment most similar to the claimant's most severe impairment.  *See Zebley*, 493 U.S. at 531.

The claimant has the burden to prove at step three that her impairment or combination of impairments is equivalent to or greater than a listed impairment.  *See id.* at 530-31; *Selders*, 914 F.2d at 619.  The listings describe a variety of physical and mental illnesses and abnormalities, and are typically categorized by the body system they affect.  *See Zebley*, 493 U.S. at 529-30.  Individual impairments are defined in terms of several specific medical signs, symptoms, or laboratory test results.  *See id.* at 530.  For a claimant to demonstrate that her disorder matches an Appendix 1 listing, it must meet *all* of the specified medical criteria.  *See id.*  An impairment, no matter how severe, does not qualify if that impairment manifests only some of the specified criteria.  *See id.*

For a claimant to qualify for benefits by showing that her unlisted impairment, or combination of impairments, is equivalent to a listed impairment, she must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.  *See id.* at 531 (citing 20 C.F.R. § 416.926(a)).  A claimant's disability is equivalent to a listed impairment if the medical findings are at least equal in severity and duration to the listed findings.  *See* 20 C.F.R. §§ 404.1526(a), 416.926(a).  The applicable regulations further provide:

> (1)(i)   If you have an impairment that is described in the Listing of Impairments in Appendix 1 of Subpart P of this chapter, but—

(A)    You do not exhibit one or more of the medical findings specified in the particular listing, or

(B)    You exhibit all of the medical findings, but one or more of the findings is not as severe as specified in the listing;

(ii)    We will nevertheless find that your impairment is medically equivalent to that listing if you have other medical findings related to your impairment that are at least of equal medical significance.

20 C.F.R. §§ 404.1526(a), 416.926(a).   Nonetheless, "[a] claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment."  *Zebley*, 493 U.S. at 531. Ultimately, the question of equivalence is an issue reserved for the Commissioner.  *See Spellman v. Shalala*, 1 F.3d 357 (5th Cir. 1993); 20 C.F.R. §§ 404.1527(e), 416.927(e).

A review of the medical records submitted in connection with Washington's administrative hearing reveals that in 1989 Washington reportedly was told by a physician affiliated with Methodist Hospital that she may have lupus due to a positive anti-nuclear antibody ("ANA").  (R. 113). Although she had no specific therapy at that time, she was placed on non-steroidal anti-inflammatory agents.  (R. 113).

On June 25, 1998, Washington met with cardiologist Gary M. Coleman, M.D. ("Dr. Coleman"), due to constant chest pain.  (R. 113).  On physical examination, Dr. Coleman reported Washington to be of average build, 5 feet 4 inches, weighing 127 pounds.  (R. 114).  Her blood pressure was 152/92.  (R. 114).  A review of Washington's gastrointestinal, cardiovascular, respiratory, neuromuscular, and musculoskeletal systems was normal.  (R. 114).  Dr. Coleman's impression was as follows: possible history of lupus in the past; hypertension; and sharp chest pain

that an electrocardiogram did not demonstrate pericarditis,[3] but symptoms and physical examination may be compatible. (R. 114-115). Dr. Coleman modified Washington's blood pressure medication, added an anti-inflammatory medication, and requested another echocardiogram be conducted. (R. 115).

On July 6, 1998, Washington underwent an echocardiogram, which indicated mild mitral regurgitation. (R. 112). On July 20, 1998, Washington was admitted to the hospital due to suspicion for sub-acute endocarditis[4] involving the mitral valve and chest pain. (R. 107). A transesophageal echocardiography was performed, suggesting suspicious mass at the anterior mitral leaflet. (R. 107, 197). Serial blood cultures, sedimentation rates, and laboratory data excluded clinically endocarditis, but revealed a positive anti-nuclear antibody. (R. 107). Thus, rheumatologist Arif S. Ali, M.D. ("Dr. Ali") was consulted for evaluation and treatment of lupus. (R. 107). Dr. Ali noted some tenderness in her metacarpophalangeal joints and left knee joint without any active synovitis.[5] (R. 200). Her muscle strength was reported a 5 in both the upper and lower extremities. (R. 200).

On July 31, 1998, Dr. Ali wrote a progress note to Washington's treating physician, David Levy, D.O. ("Dr. Levy"), reporting his diagnosis of lupus as well as a treatment plan. (R. 194-195). Dr. Ali noted that, upon examination, Washington heart sounds were normal, musculoskeletal tenderness in MCPs and PIPs without any actual synovitis, normal range of motion, tenderness in elbows and knees, and normal muscles strength in both upper and lower extremities. (R. 195).

---

[3] "Pericarditis" refers to inflammation of the pericardium (*i.e.*, the fibroserous sac that surrounds the heart and the roots of the great vessels, comprising an external layer of fibrous tissue and an inner serous layer). *See* DORLAND'S, *supra*, at 1351-1352.

[4] "Endocarditis" refers to inflammation of the endocardium (*i.e.*, the endothelial lining membrane of the cavities of the heart and the connective tissue bed on which it lies). *See* DORLAND'S, *supra*, at 592-593.

[5] "Synovitis" means inflammation of a synovial membrane, especially that of a joint; in general, when unqualified, the same as arthritis. *See* STEDMAN'S MEDICAL DICTIONARY 1773 (27th ed. 2000).

On August 21, 1998, Washington returned for a follow-up with Dr. Ali, but due to his absence, Washington was seen by another physician, Annie T. Varughese, M.D. ("Dr. Varughese). (R. 110).  At that time, Washington was observed to be crying, noting that she had been ill since 1989, but her lupus was not diagnosed until recently.  (R. 110-111).  A cardiovascular examination revealed regular rate and rhythm and her lungs were clear.  (R. 110).  Dr. Varughese requested that Washington wait to return to work until after she saw Dr. Ali.  (R. 111).

In July and August 1999, Washington visited a specialist in obstetrics and gynecology, Dudley Baker, M.D. ("Dr. Baker"), complaining of heavy menses. (R. 155, 157-159).  Washington completed a questionnaire, indicating that she was experiencing symptoms commonly associated with an overactive bladder.  (R. 148).  Washington underwent a pelvic ultrasound, which showed a dominant fibroid measuring 3.0 cm. in diameter.  (R. 150).

On September 3, 1999, Washington was admitted to the hospital due to atypical chest pain. (R. 117).  The attending emergency room physician noted that her blood pressure was somewhat elevated upon arrival, but otherwise appeared quite well.  (R. 122).  Washington reported that her lupus had been well controlled lately.  (R. 122).  Hospital records indicated that her chest pain was similar to that presented one year previously when she was initially diagnosed and characterized as having lupus.  (R. 117).  The records further reported that Washington had lupus with "borderline laboratory data."  (R. 117).  Washington's blood work indicated that she was anemic, which was attributed to heavy menses and lupus.  (R. 117).  Dr. Ali was consulted and, upon examination, observed some weight loss, no rash on face, no enlarged lymph nodes in the neck, normal thyroid, normal heart sounds, no cyanosis[6] and no swelling in the extremities, tenderness in both knees

---

[6] "Cyanosis" refers to a bluish discoloration, especially of the skin and mucous membranes due to excessive concentration of deoxyhemoglobin in the blood.  *See* DORLAND'S, *supra*, at 439.

14

medially and laterally, tenderness in the ankles, but no acute synovitis in any small joints of the hands, and muscle strength was grade 5 in both upper and lower extremities. (R. 125). Steroid therapy was initiated as well as oral iron therapy. (R. 117-118). Dr. Coleman's impression was atypical chest pain, related to lupus; moderate to severe anemia, secondary to either severe menses, lupus, poor nutritional status or a combination of all three; mitral valve prolapse and mitral regurgitation, stable; and weight loss (120 pounds) attributable to lupus but also due to Washington's anorexia for unclear reasons. (R. 120, 204-205).

In November 1999, Washington visited her ob/gyn complaining of dysfunctional uterine bleeding, incontinence and severe dysmenorrhea. (R. 146). Washington's medications were reportedly "working fine" and that she had slight improvement on Detrol; hence, her medication was adjusted. (R. 146).

In September 2000, Washington reported in a routine visit to Dr. Ali that she was experiencing pain in her upper spine and both knees. (R. 177-178). Dr. Ali observed Washington to be "otherwise stable." (R. 178). Dr. Ali increased her dosage of steroid medication and continued her other medications. (R. 178).

In November 2000, Washington visited Dr. Ali, complaining of pain in both knees, pain in her upper back, tender points in muscles, joint pain, and joint stiffness. (R. 175-176). Dr. Ali noted that Washington had been experiencing knee pain for the previous month and believed it to be related to the weather. (R. 176). Dr. Ali refilled Washington's medications. (R. 176).

On February 1, 2001, Washing visited Dr. Ali for a routine examination, complaining of knee pain and difficulty walking. (R. 173). Washington also reported joint pain and joint stiffness due to the cold weather. (R. 174). Washington received injections in both knees. (R. 173).

On March 1, 2001, Washington visited Dr. Ali, reporting pain in both her knees, tender points in muscles, and joint pain. (R. 171-172). Dr. Ali observed no synovitis. (R. 171). Dr. Ali's assessment was lupus exacerbation; thus, he modified Washington's medication. (R. 171).

In April 2001, an ophthalmologist examined Washington's eyes and found no abnormalities that would preclude continued use of Plaquenil therapy. (R. 133-134). Washington also saw Dr. Ali in April 2001, complaining of joint pain and excessive fatigue. (R. 166-167). Dr. Ali noted that Washington reportedly had a headache, but was doing "okay." (R. 167). She had no fever, no rash, and no stomach pain. (R. 167).

In May 2001, Washington visited Dr. Ali, complaining of knee pain, joint pain and joint stiffness. (R. 164-165). Dr. Ali reviewed her medications and also referred Washington for a consultation visit with a specialist in obstetrics and gynecology. (R. 165).

On June 7, 2001, Washington visited Stuart Rosenthal, M.D. ("Dr. Rosenthal") for a rehabilitation examination. (R. 129-130). At that time, she complained of pain all over her body and reported multiple somatic complaints, including weakness and fatigue. (R. 129). Washington was observed as tearful sometimes during the examination. (R. 129). Dr. Rosenthal noted that Washington's back was non-tender and she had good range of motion with normal curvature. (R. 129). Washington alleged pain flexing beyond 60 degree vertical. (R. 129). Washington's extremities showed no evidence of arthritis. (R. 130). Dr. Rosenthal observed no swelling, clubbing, cyanosis, edema, or evidence of vasculitis. (R. 130). Washington had full range of motion of all joints. (R. 130). Additionally, there was no muscle atrophy. Her grip strength was noted as adequate although a bit week. According to Dr. Rosenthal, Washington showed excellent control

of her lupus.  (R. 130).  Dr. Rosenthal questioned the role of narcotics for treatment of her musculoskeletal condition and opined that "[t]here may be a component of depression."  (R. 130).

In July 2001, Washington visited Dr. Baker, complaining of heavy menses and cramps. (R. 137).  A gynecological ultrasound report indicated an ovarian cyst and uterine fibroids.  (R. 138). On July 16, 2001, Washington was examined by a state agency physician, E.R. Leggett, M.D. ("Dr. Leggett").  (R. 196).  Dr. Leggett reported that Washington complained of some pain and discomfort with activity, but otherwise he noted the examination was normal.  (R. 196).  Dr. Leggett found that Washington was capable of work activity and that her allegations were not supported by the medical records in the file.  (R. 196).  Dr. Leggett's findings were affirmed by Bonnie Blacklock, M.D. (R. 196).

In a routine visit, on August 2, 2001, Dr. Ali noted that Washington had osteoarthritis[7] in her knees.  (R. 161).  Washington received an injection in both knees.  (R. 161).

On November 9, 2001, Washington was admitted to the hospital with complaints of syncope,[8] dizziness, lupus exacerbation, anemia, and hypertension.  (R. 210).  After receiving a blood transfusion, Washington began improving.  (R. 210).  Washington underwent a esophagogastroduodenoscopy as well as a colonoscopy, which revealed antral ulcers, gastritis, and internal hemorrhoids.  (R. 211-212).  An MRI of Washington's brain revealed a 1.0 cm. cyst in the pineal gland; otherwise, the MRI was unremarkable.  (R. 231, 234).  An examination of

---

[7] "Osteoarthritis" refers to a noninflammatory degenerative joint disease seen mainly in older persons, characterized by the degeneration of the articular cartilage, hypertrophy of bone at the margins, and changes in the synovial membrane.  It is accompanied by pain, usually after prolonged activity, and stiffness, particularly in the morning or with inactivity.  *See* DORLAND'S, *supra*, at 1286.

[8] "Syncope" means a temporary suspension of consciousness due to generalized cerebral ischemia; a faint or swoon.  *See* DORLAND'S, *supra*, at 1747.

Washington's extremities revealed no edema, clubbing, or cyanosis. (R. 213, 215, 217). Washington's back showed no signs of CVA tenderness. (R. 215). It was noted by a consulting physician that Washington's lupus "had been under fairly good control with Plaquenil and steroids." (R. 215). The attending physician, Nihal U. Siddiqui, M.D. ("Dr. Siddiqui") observed Washington's strength to be 5/5 in all extremities. (R. 217). Dr. Siddiqui further reported that Washington had no joint swelling or tenderness. (R. 217). No acute synovitis was shown in any small or large joints of upper or lower extremities. (R. 219). The strength in her hand grips was noted as both strong and present. (R. 217).

Because of Washington's concern regarding the cyst on her brain, Washington was referred to Lynette M. Gogol, D.O. ("Dr. Gogol") for a neurological evaluation. (R. 234-235). Dr. Gogol observed her trapezius strength as 5/5. (R. 235). Motor examination further revealed mild generalized weakness graded 5-/5. (R. 235). Dr. Gogol further observed slightly increased tone in the lower extremities left greater than right. (R. 235). Dr. Gogol's impression was that the cyst represented an incidental finding on the imaging study. (R. 235). Dr. Gogol neurologically cleared Washington for a hysterectomy. (R. 235). Thereafter, on December 4, 2001, Dr. Baker performed a supracervical hysterectomy on Washington to assist with her complaints of menorrhagia, anemia, and uterine fibroids, in. (R. 236-238). Dr. Baker observed no clubbing, cyanosis, or edema at the time of surgery. (R. 240).

On January 15, 2002, Washington visited Dr. Levy, complaining of high blood pressure. (R. 262-263). Washington reported still having some dizziness. (R. 262). Dr. Levy noted that in her extremities, Washington had full range or motion with no cyanosis and no edema. (R. 263). Dr. Levy noted that Washington had normal mood/affect. (R. 263). He adjusted Washington's

medication and scheduled a follow-up appointment for two weeks later.  (R. 263).  On January 29, 2002, Washington returned to Dr. Levy for a follow-up examination.  (R. 260-261).  She reported feeling okay and that her dizziness had improved.  (R. 260).  No muscle weakness, edema, anxiety or depression was noted.  (R. 260).  Dr. Levy observed that in her extremities, Washington had full range or motion with no cyanosis and no edema.  (R. 261).

In May 2002, Washington visited Dr. Ali, complaining of joint pain and stiffness.  (R. 279-280).  In July 2002, Washington visited Dr. Ali for a routine appointment.  (R. 277-278).  Washington complained of joint pain, joint stiffness, and excessive fatigue.  (R. 278).  Upon examination, Dr. Ali noted that Washington was "overall stable."  (R. 278).

"[O]rdinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Greenspan*, 38 F.3d at 237; *accord Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).  The opinion of a specialist generally is accorded greater weight *than* that of a non-specialist.  *See Newton*, 209 F.3d at 455; *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994), *overruled on other grounds by Sims v. Apfel*, 530 U.S. 103, 108 (2000).  Medical opinions are given deference, however, only if those opinions are shown to be more than conclusory and supported by clinical and laboratory findings.  *See Scott*, 770 F.2d at 485.  Moreover, a treating physician's opinions are far from conclusive and may be assigned little or no weight when good cause is shown.  *See Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Greenspan*, 38 F.3d at 237.  Good cause may permit an ALJ to discount the weight of a treating physician's opinion in favor of other experts when the treating physician's evidence is conclusory, unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise

19

unsupported by the evidence.  *See Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 456; *see also Brown*, 192 F.3d at 500; *Greenspan*, 38 F.3d at 237; *Paul*, 29 F.3d at 211.  It is well settled that even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status. *See Paul*, 29 F.3d at 211; *accord Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 455.

In the present case, based on the objective medical facts and opinions of physicians, there is substantial evidence in the record to support the ALJ's determination that Washington suffered from impairments which did not meet or equal the requirements of a listing.  At the hearing Dr. Goldstein testified that Washington does not have an impairment that meets or equals the criteria of any impairment enumerated in the Listings for a period of 12 months or longer.  (R. 327).  Section 14.02 of the Listings was not met because Washington did not demonstrate that the lupus had resulted in even moderate involvement of any of her organs or body systems.  Indeed, after reviewing her medical records, Dr. Goldstein's impression of Washington's lupus was that it had improved considerably and seemed to be in remission with normal anti-nuclear antibody tests, normal sedimentation rate, and normal physical examinations.  (R. 274, 337-339, 342).

Listing 7.02, which pertains to anemia, was not met because Washington did not require treatment with blood transfusions on  average of once every two months and the anemia had not caused significant damage to a body system.  Indeed, in his testimony, Dr. Goldstein noted that Washington's hematocrit and hemoglobin levels were in the normal range; thus, at that time, Washington's anemia had cleared up.  (R. 273, 331, 339).

Washington failed to meet the criteria for Listing 4.03, as it relates to high blood pressure, because her high blood pressure has not resulted in significant end organ damage.  Finally, Listing

12.02 was not met, as there was no evidence of any organic mental disorder.  (R. 24).  Although Dr. Rosenthal noted that Washington was somewhat tearful during his examination and that there may be an element of depression (R. 129-130), Washington admitted during the administrative hearing that she had not sought or received any mental health treatment.  (R. 319-320).  Additionally, progress notes from Dr. Levy indicated that Washington had normal mood/affect, and no signs of anxiety or depression were noted.  (R. 260, 263).  The mere fact that a condition is identified or diagnosed does not establish disability; the proper focus in assessing a claim of disability is the degree of functional impairment attributable to the condition.  *See Hames*, 707 F.2d at 165.  Here, Washington failed to establish a functional impairment due to depression.

In sum, based on the objective medical facts and opinions of physicians, there is substantial evidence in the record to support the ALJ's determination that Washington suffered from impairments which did not meet or equal the requirements of a listing

### 2.    *Subjective Complaints*

The law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints.  *See Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994) (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1981)).  When a plaintiff alleges disability resulting from pain, she must establish a medically determinable impairment that is capable of producing disabling pain.  *See Ripley*, 67 F.3d at 556 (citing 20 C.F.R. § 404.1529).  Once a medical impairment is established, the subjective complaints of pain must be considered along with the medical evidence in determining the individual's work capacity.  *See id.*  It is well settled that an ALJ's credibility findings on a claimant's subjective complaints are entitled to deference.  *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Scott v. Shalala*, 30 F.3d 33, 35 n.2 (5th Cir. 1994); *Falco*, 27 F.3d at 164; *Wren*, 925 F.2d

at 128.  The Fifth Circuit recognizes that "the ALJ is best positioned" to make these determinations because of the opportunity to observe the claimant first-hand.  *See Falco*, 27 F.3d at 164 n.18.  Moreover, "[t]he Act, regulations and case law mandate that the Secretary require that subjective complaints be corroborated, at least in part, by objective medical findings."  *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988) (citing 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529; *Owens v. Heckler*, 770 F.2d 1276, 1281-82 (5th Cir. 1985)); *accord Chambliss*, 269 F.3d at 522 (citing *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989)); *Hampton v. Bowen*, 785 F.2d 1308, 1309 (5th Cir. 1986).

As a matter of law, the mere fact that working may cause a claimant pain or discomfort does not mandate a finding of disability.  *See Hames*, 707 F.2d at 166; *Epps v. Harris*, 624 F.2d 1267, 1274 (5th Cir. 1980); *accord Brown v. Bowen*, 794 F.2d 703, 707 (D.C. Cir. 1986).  Additionally, the mere existence of pain does not automatically bring a finding of disability.  *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989); *Owens*, 770 F.2d at 1281.  It must be determined whether substantial evidence indicates an applicant can work despite being in pain or discomfort.  *See Chambliss*, 269 F.3d at 522; *Johnson v. Heckler*, 767 F.2d 180, 182 (5th Cir. 1985).

For pain to rise to the level of disabling, that pain must be "constant, unremitting, and wholly unresponsive to therapeutic treatment."  *Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128.  The decision arising from the ALJ's discretion to determine whether pain is disabling is entitled to considerable deference.  *See Chambliss*, 269 F.3d at 522; *Wren*, 925 F.2d at 128; *James*, 793 F.2d at 706.  However, an ALJ may discount subjective complaints of pain as inconsistent with other evidence in the record.  *See Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) (citing *Wren*, 925 F.2d at 128 (citation omitted)).

At the administrative hearing, Washington testified regarding her complaints of pain. (R. 308-312, 315-317, 320, 324, 343-344). The ALJ's decision indicates that the ALJ did consider objective and subjective indicators related to the severity of Washington's pain:

> The claimant alleges that her impairments cause weakness, pain, and chronic fatigue. She must lie down for 2 hours everyday. She has a loss of grip strength in her hands. She has pain all over her body, especially in the joints of the back, knees, and hands. She can walk 12 feet or stand only 2 to 3 minutes before needing to sit. She can sit for only 30 minutes before needing to lie down. The sun makes her sick. She cries once or twice every day. Lupus has affected her heart and eyesight. She has had steroid injections in her knees and arms. Her pain medications cause side effects such as sleepiness and the need to avoid sunlight. She sometimes needs help dressing. She may have an organic brain disorder. Witness G. Higginbotham testified that she sees the claimant 6 to 8 times per month. She has noticed a decline in the claimant's grip strength. She has seen her have difficulty opening a pill bottle.

> The objective medical evidence does not support the claimant's allegations. Physical examination of the claimant have shown only minor restrictions in motor strength or sensory systems (Exhibits 4F and 14F). She has no heart disease; and the only eye examination report in the record states that she has no eye abnormalities (Exhibit 5F, page 3). A November 2001 CT scan of the brain showed no acute abnormalities (Exhibit 12F). There is no other objective evidence of an organic brain disorder, and there is no diagnosis of an organic brain disorder in the record. The claimant has not sought treatment from a mental health professional for a mental impairment, such as depression. The failure to seek specialist treatment indicates that depression is not a significant impairment or symptom[].

> The claimant is treated with medications for her impairments and symptoms (Exhibit 20). The record does not show that she has complained of significant side effects of her medications or other treatments. The claimant testified that her pain medications do provide some relief.

> * * *

> Based on this combination of factors, the undesigned finds that the claimant's alleged limitations and symptoms are no wholly credible, insofar as she and her witness allege that her impairments, symptoms, and limitations preclude all work activities (Social Security Ruling 96-7p).

(R. 24-25). The ALJ's findings are supported by the medical records.

Washington claims she became disable in August 2000. (R. 65). Dr. Ali noted in September 2000 that, despite Washington's complaints of pain in her upper spine and knees, Washington was "otherwise stable." (R. 178). Likewise, in November 2000, although Washington complained of pain, Dr. Ali reported she was "okay." (R. 176). In February 2001, Dr. Ali injected Washington's knees with steroid medication, and prescribed medication on March 1, 2001. (R. 173-174). At the time of Washington's March 1, 2001, visit, Dr. Ali reported no synovitis. (R. 171). In a visit to Dr. Ali on May 2, 2001, Washington complained that her knees were painful on walking. (R. 165). Washington received steroid injections in her knees on August 2, 2001, and was advised to continue oral medication. (R. 161). Medical impairments that reasonably can be remedied or controlled by medication or treatment are not disabling." *Glenn v. Barnhart*, 124 Fed. Appx. 828, 829 (5th Cir. 2005) (citing *Johnson v. Bowen*, 864 F.2d 340, 347 (5th Cir. 1988); *Fraga v. Bowen*, 810 F.2d 1296, 1303-04 (5th Cir. 1987); *Adams v. Bowen*, 833 F.2d 509, 511-12 (5th Cir. 1987)).

Although Washington contends that the medication did not relieve her symptoms, as set forth above, her contention is belied by the objective medical records. In June 2001, Dr. Rosenthal found that Washington had good range of motion with normal curvature, that her extremities showed no evidence of arthritis, and that there was no swelling, clubbing, cyanosis, edema, or evidence of vasculitis. (R. 129-130). Washington demonstrated full range of motion of all joints, and there was no muscle atrophy. (R. 130). She also had a normal gait. (R. 130). Her neurological examination revealed intact cranial nerves, normal sensation, no ataxia, and normal muscle strength. (R. 130). Dr. Rosenthal further observed that Washington had a normal ability to sit, stand, move about, lift, carry and handle objects. (R. 130). Dr. Rosenthal further reported that, although Washington complained of pain, she had normal passive and active range of motion of all

joints, and that there was no evidence of spasm, loss of motion, muscle atrophy, or abnormal motor, sensory, or reflex changes.  (R. 130).  According to Dr. Rosenthal, Washington's prescription medication for lupus showed "excellent control of the disease."  (R. 130).

In November 2001, when Washington was hospitalized for syncopal attacks, dizziness, falling down episodes, nausea, vomiting and generalized body aches, her physical examination showed that there was no cyanosis, clubbing or edema in her extremities.  (R. 217).  Additionally, a neurological examination showed that her cranial nerves were grossly intact, and her motor strength was 5/5 in all extremities.  (R. 217).  There was no joint swelling or tenderness, and her hand grips were noted as strong and present.  (R. 217).   No acute synovitis was observed in any small or large joints of her upper or lower extremities.  (R. 219).  This evidence was consistent with previous examinations.

In December 2001, Dr. Gogol examined Washington and reported that the motor examination revealed "mild generalized weakness graded 5-/5."  (R. 235).  Although the sensory examination indicated that vibration was slightly reduced in Washington's toes and that there was a decreased sensation to light tough in her left arm and leg, "the remainder of the sensory examinations, including pinprick, proprioception, and temperature, is normal."  (R. 235). Additionally, Washington was observed to have a normal stride and ease, and there was "no significant paravertebral muscle tenderness to palpation."  (R. 235).   Because the objective evidence failed to substantiate the amount of pain and/or limitations alleged by Washington, the ALJ correctly discounted Washington's credibility.  (R. 25).

Washington's complaint that the ALJ erred by placing too much emphasis on his own observations of Washington during the administrative hearing and improperly subjected Washington

to "sit and squirm" jurisprudence is misplaced.  *See Muncy v. Apfel*, 247 F.3d 728, 736 (8th Cir. 2001); *Flores v. Massanari*, 19 Fed. Appx. 393, 404 (7th Cir. 2001); *Puckett v. Barnhart*, No. 1:01-cv-584, 2003 WL 1831066, at *9 (E.D. Tex. Feb. 5, 2003).  While a claimant's demeanor may not be relied upon exclusively to deny benefits, an ALJ may cite to a claimant's demeanor at the hearing if it is clear that the ALJ, as here, considered other factors to deny disability benefits.  *See Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987); *see also Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990); *Burnside v. Bowen*, 845 F.2d 587, 592 (5th Cir. 1988), *abrogated on other grounds by Sullivan v. Zebley*, 493 U.S. 521 (1990).  In the case at bar, the ALJ considered the hearing testimony and carefully reviewed the medical evidence before reaching his decision; he did not merely rely on a "sit and squirm doctrine" to discount her credibility.  (R. 24-25).

Although Washington testified at the administrative hearing that her medication made her sleepy (R. 309), there was sufficient legal reason to reject complaints of disabling side effects of medication because there is no evidence in the record that Washington complained about these effects to her treating physician.  *See Hajek v. Shalala*, 30 F.3d 89, 92 (8th Cir. 1994).  Washington's testimony, without more, is insufficient to establish that medication side effects constituted a significant work-related limitation.  *See Wren*, 925 F.2d at 125; *Houston*, 895 F.2d at 1016 (subjective complaints must be corroborated at least in part by objective medical evidence).

The Court does not doubt that Washington suffers from pain; however, the records do not support a finding that Washington's pain is constant, unremitting, and wholly unresponsive to therapeutic treatment.  *See Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128.  Accordingly, there is substantial evidence that supports the ALJ's finding that Washington's

subjective reports of pain do not rise to the level of disability.  *See Ortiz v. Barnhart*, 70 Fed. Appx.

162, 164 (5th Cir. 2003); *Jones v. Barnhart*, 35 Fed. Appx. 390 (5th Cir. 2002).

### 3.   *Residual Functional Capacity*

Under the Act, a person is considered disabled:

. . . only if h[er] physical or mental impairment or impairments are of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for h[er], or whether [s]he would be hired if [s]he applied for work. . . .

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  The Commissioner bears the burden of proving that a

claimant's functional capacity, age, education, and work experience allow her to perform work in the

national economy.  *See Brown v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *see also Masterson*, 309 F.3d

at 272; *Watson*, 288 F.3d at 216; *Myers*, 238 F.3d at 619; *Greenspan*, 38 F.3d at 236.   If the

Commissioner fulfills this burden by pointing out potential alternative employment, the claimant, in

order to prevail, must prove that she cannot perform the alternate work suggested.  *See Masterson*,

309 F.3d at 272; *Boyd*, 239 F.3d at 705; *Shave*, 238 F.3d at 594; *Carey v. Apfel*, 230 F.3d 131, 135

(5th Cir. 2000).

To determine whether a claimant can return to a former job, the claimant's "residual

functional capacity" must be assessed.  *See Moore v. Sullivan*, 895 F.2d 1065, 1068 (5th Cir. 1990);

*see also* 20 C.F.R. § 404.1545.  This term of art merely represents an individual's ability to perform

activities despite the limitations imposed by an impairment.  *See Villa v. Sullivan*, 895 F.2d 1019,

1023 (5th Cir. 1990); *see also* 20 C.F.R. § 404.1545.  Residual functional capacity combines a

medical assessment with the descriptions by physicians, the claimant or others of any limitations on

the claimant's ability to work.  *See Elzy v. Railroad Retirement Bd.*, 782 F.2d 1223, 1225 (5th Cir.

1986); *see also* 20 C.F.R. § 404.1545.  When a claimant's residual functional capacity is not sufficient to permit her to continue her former work, then her age, education, and work experience must be considered in evaluating whether she is capable of performing any other work.  *See Boyd*, 239 F.3d at 705; 20 C.F.R. § 404.1520.  The testimony of a vocational expert is valuable in this regard, as "she is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986); *accord Carey*, 230 F.3d at 145; *see also Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995).

In evaluating a claimant's residual functional capacity, the Fifth Circuit has looked to SSA rulings ("SSR").  *See Myers*, 238 F.3d at 620.  The Social Security Administration's rulings are not binding on this court, but they may be consulted when the statute at issue provides little guidance. *See id.*  In *Myers*, the Fifth Circuit relied on SSRs addressing residual functional capacity and exertional capacity.  *See id.*  In that case, the court explained:

> First, SSR 96-8p provides that a residual functional capacity (RFC) is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule.  The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities. However, without the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work. . . .  RFC involves both exertional and non-exertional factors. Exertional capacity involves seven strength demands:  sitting, standing, walking, lifting, carrying, pushing, and pulling.  Each function must be considered separately. In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis. . . .  The RFC assessment must include a resolution of any inconsistencies in the evidence.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34474-01 (July 2, 1996).  The court further commented:

Second, SSR 96-9p also provides that initially, the RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to perform work-related activities. . . .  The impact of an RFC for less than a full range of sedentary work is especially critical for individuals who have not yet attained age 50.  Since age, education, and work experience are not usually significant factors in limiting the ability of individuals under age 50 to make an adjustment to other work, the conclusion whether such individuals who are limited to less than the full range of sedentary work are disabled will depend primarily on the nature and extent of their functional limitations or restrictions.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34478 (July 2, 1996).  The court also noted that SSR 96-9p defines "exertional capacity" as the aforementioned seven strength demands and requires that the individual's capacity to do them on a regular continuing basis be stated.  *See id.*  To determine that an claimant can do a given type of work, the ALJ must find that the claimant can meet the job's exertional requirements on a sustained basis.  *See Carter v. Heckler*, 712 F.2d 137, 142 (5th Cir. 1983) (citing *Dubose v. Matthews*, 545 F.2d 975, 977-78 (5th Cir. 1977)).

In the case at bar, the medical expert testified, based on his review of the record, that Washington was capable of performing sedentary or light exertional activities throughout the period at issue, with her only limitation being to avoid sunlight.  (R. 328).  The VE testified that Washington past relevant work as a data entry clerk and clerk typist are sedentary, semi-skilled jobs.  (R. 88-89, 344-345).  Although Washington argues that the ALJ erred in finding she could perform her past relevant work because he did not perform a function-by-function assessment to compare her RFC with the demands of her past relevant work, her contention is unfounded.  In response to hypothetical questions posed by the ALJ, the VE testified that a person with Washington's residual functional capacity for sedentary work could perform her past relevant work as a data entry clerk and/or clerk typist, as she performed those jobs.  (R. 345-346).

29

The Fifth Circuit has observed that in determining a claimant's ability to work, a vocational expert " . . . is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Carey*, 230 F.3d at 145.  Unlike the Dictionary of Occupational Titles, which simply gives a general description of the job duties involved, a vocational expert is able to compare the unique requirements of a specified job with the particular ailments a claimant suffers in order to reach a reasoned conclusion as to whether the claimant can perform the specific job.  *See Fields*, 805 F.2d at 1171.  Because the hypothetical questions articulated by the ALJ reasonably incorporated the restrictions and impairments recognized by the ALJ, the ALJ properly accepted the VE's testimony that Washington could perform her past relevant work.  *See Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).

### III.    *Conclusion*

In sum, the record provides substantial evidence supporting the Commissioner's decision that Washington is not disabled.  It is, therefore

**ORDERED** that Washington's First Amended Motion for Summary Judgment (Docket Entry No. 24) is **DENIED**.  It is further

**ORDERED** that Commissioner's Motion for Summary Judgment (Docket Entry No. 25) is **GRANTED**.  It is further

**ORDERED** that the Commissioner's decision is **AFFIRMED**.  Finally, it is

**ORDERED** that this matter is **DISMISSED** from the dockets of this Court.

**SIGNED** at Houston, Texas, on this the 23rd day of March, 2006.

Calvin Botley
United States Magistrate Judge